Hi, Melissa Shimizu for the appellate, Southwest Regional Council of Carpenters, and I would like to reserve three minutes for a minute, if possible. Can you speak up first, please, because I have a slight hearing problem. Thank you. I'll stand closer. Okay, so this is a matter to confirm an arbitration award, which is a summary of proceeding. Courts are highly deferential to arbitration awards, especially in the labor context, in part because the parties have bargained for the arbitrator to render their decision on these disputes. They have bargained for the arbitrator to make factual findings and for them to interpret the contractual agreements. Review of these awards is very narrow, and vacating them only occurs under very rare circumstances, and when reviewing these arbitration awards, the court should not engage in independent fact-finding and should confirm the arbitration award so long as the arbitrator was attempting to interpret the party's agreement. Here, the court did engage in independent fact-finding. In fact, they say that Drywall now asserts for the first time that it never received notice of the negotiations and it did not affirmably agree to the 2009 MOU, and it goes on to say— Is that what the district court said? Was it for the first time? Yes, it was. I thought that they said something along these lines after the board decided, the panel decided the issue, and then when they got up after the second interim decision, they said something like, we never actually agreed to this. I'm not sure I know what you're referring to, but the district court does say on a— The district court's premise was that they didn't, is that right? Right. And then they went on to say that they could not consider this evidence because it was new, and they knew that they were not the fact-finder. However, when the court went on to find that the arbitration awards were not a plausible interpretation of the contract and that the 2009 MOU violated public policy, they relied specifically on these two facts. For example, when the court found that the 2009 MOU was They said it was because Drywall did not have advance notice of the premature negotiations, a fact that they said was new and presented to them for the first time, and also because they said that Drywall never affirmatively agreed to the 2009 MOU, which it also said was raised for the first time before them. Sorry, it looked like you were going to ask me something. They did not affirmatively agree to the 2009 MOU. Additionally, the district court relied heavily on the Action Electric decision, which is the Eighth Circuit decision, and it did state that in Action Electric, the court had to balance the necessariness for stability versus voluntariness in participating in these multi-bargaining agreements. The court went on to say it has to do a case-by-case analysis for each situation between the relationships between the union and the employers' association, so it should look to the bargaining history and to the expressed agreements between the parties, and if there is any intent or anything that could be interpreted as intent on the part of the union that the employer wanted to be bound. And these facts, they do favor finding that the 2009 MOU is binding upon But is that whole policy a – I mean, this court has been – and the Supreme Court have both been extremely tough on what is a sufficiently definite, well-established, and dominant policy to meet the public policy standard, and what exactly public policy – does this meet the standard quite aside from any fact findings or anything else? It was the union's position in the district court that it did not. And what's your position now? It does? No, but I was just prepared to argue that, even if you – Well, why don't you just argue what you can argue instead of – I mean, answer my questions. Is this a policy that would meet the standard? I don't think that it is. It's not – it's not based on any statute. It's not based on a constitutional right. And besides which, it's equivocal. In other words, it's not even a policy that says you can or you can't do something. It says it depends. Right. So a policy that says it depends doesn't sound like a very strong, dominant, and unequivocal policy that establishes a firm public policy. Correct. And I think that we would also argue that the award itself did not militate specifically against a policy for voluntariness, because Drywall – it did voluntarily sign the signatory agreements. It voluntarily decided to take the reduction in the contribution rate. It voluntarily decided to delegate its authority to bargain to the Employers Association. So even – so, yeah, I don't – it would not meet the public policy exception to overturn the award. As far as finding that the agreement was an implausible interpretation of the Parties Agreement – Is plausibility in the sense of – in a colorable – what exactly is the standard? Do you – with regard to overturning arbitration awards in the collective bargaining context? And plausibility sounds like kind of a – I mean, I guess it's taken on – the trouble with the plausibility standard in the modern world language is that it now is hooked into the Iqbal standard, and it sounds like that's what we're doing. Is that what we're doing here? I would say that it goes further than that, because in a lot of the – in a lot of the what is plausibility and when should an arbitration award be vacated, they say that it's not a decision on the merits and that even if the arbitrator misinterpreted the agreement and even if the court vehemently disagrees with the decision that the arbitrator made, so long as they are attempting to interpret the contractual agreement, that's sufficient. And then that's what our on-bank case in the Hawaii case said. Correct. All right. So when you use the word plausibility nowadays, it sounds like it's something different than that. I would agree. But I gather you're not arguing for an Iqbal kind of plausibility. You're arguing for was he even in the ballpark of purporting to interpret the contract. Correct. And if you look at the arbitrator's awards, he did try to interpret the party's agreements and he looked to past practice. And he looked not only at the 2009 Memorandum of Understanding alone. He looked at the Master Labor Agreement and other terms in there. He found that the employers' association and the union gave consideration to one another for this agreement. And he found that the employers' association delegated the authority to negotiate on behalf of the employer. But I guess the crux, and I'm sure I'm going to be hearing about this from your opponent, is that the contract fairly unusually does say that there has to be affirmative written consent. Correct. And I gather what disturbed the district court was whether how they could have found that. One of your responses is, well, there was no evidence one way or the other actually before the panel and the district court filled in facts and he can't do that. Correct. But, I mean, is that your only response to that or is there also an argument that there was a, that they were looking at the contract sufficiently even with regard to that question? Sure. So before the arbitration panel, there is undisputed testimony that Drywall took the reduced contribution rate that was negotiated for. That is correct. Do you know where that is in the record? Yes. It is on, I think the record, the excerpt of the record at page 95 to 96. And there the contract administrator for the union testified that they took this reduced contribution rate. So based on that, even though they might not have signed the agreement, they, for an entire year, they took the entirety of the benefit of the agreement for their behalf and when it was their turn to perform, which would be to oblige by the extension to 2011. Your understanding of the, when he says, and what effect does that have upon Drywall dynamics that affected the wages they paid in 2009, 2010, you're saying that that can be understood as saying that's what they actually paid. Correct. Andrella didn't raise the argument before the arbitrator that it didn't affirmatively agree and it didn't raise any argument that they didn't accept this lower rate. So in other words, if the board had been aware of this affirmative requirement, they could have interpreted the contract to mean that it could be essentially waived by actually paying the wages that were allowed by that provision. Correct. Or accepted by conduct. Correct. Because by the time the hearing occurred, the entire 2010, that year that they accepted the lower bargain, it would have occurred. Additionally, sorry, I guess, so, and also because the issue was never raised before the arbitrator, this created difficulty of having a sufficient record for the district court to review. And that is not through any fault of the arbitration panel. If an issue is not raised and the factual record is not developed, then there's nothing for the district court to review and because it can't go in to find its own facts, it was improper for them to then go and try to find out if there was notice or if there was affirmative agreement or if there is some type of writing that could have constituted consent to be obligated to this 2009 MOU. So the district court here did go above and beyond what authority was delegated to them and what they were permitted to do in this situation. Is it possible for me to just save the rest of the time for rebuttal? Sure. Thanks. Good morning. I'm Rick Sutherland here on behalf of Respondent Annapolis Drywall Dynamics Incorporated. There are really five reasons why this court should affirm the district court's dismissal or vacation of the underlying arbitration award. First, the fact that that award was based on a 2009 Memorandum of Understanding that limited its application to members of the multi-employer bargaining unit did not extend to Drywall Dynamics because it was not a member of that group. Second... You've made that argument before. I'm sorry, Your Honor. You have made that argument before. The... But let me address that. Yes, Your Honor. The arguments, first of all, of course, the union never objected to it. First say yes or no. Your Honor, these arguments were made. Have you made that argument before? Yes. Where? It was made to the panel twice. This new agreement doesn't apply to you? Correct. Yes, Your Honor. And they rejected it both times? They never addressed it. They ignored it completely. But they... Okay. Go ahead. So the first time it was made, you will note in all three of the panel's decisions that they refer to the parties having submitted post-hearing briefs after the first arbitration hearing. And in that post-hearing brief submitted by Drywall Dynamics at page 16, it provides, quote, however, what the union cannot show is that Drywall Dynamics ever agreed to be bound by an agreement extending their relationship after that date, meaning the June 30th, 2010 date. The April of 2009 memorandum understanding that the union purports extend to Drywall Dynamics relationship into 2011 provided that, quote, within the quote, Drywall Lathing members shall have until May 18th, 2009 to provide written notice to the WWCCA Drywall Lathing Conference of their decision to affirmatively agree to be bound by this agreement, end quote. And then the brief goes on to discuss the reasons why that MOU does not apply. Did the district court address this issue? Did the district court? I'm sorry. Did the district court address this current, this issue that you're now raising, i.e., whether the... I understand the part about the affirmative occurrence, the affirmative acceptance. I understand that you raised that in the district court, but I understand you're saying something slightly different now. Yes. I was quoting from the... I don't know what you're quoting from. I understand that you are arguing that this whole agreement didn't apply to them because it only applied to members of the association. Correct. Did the district court... Did you argue that in the district court? Did the district court address it? Yes. Where? Multiple times throughout every member... Not the affirmative agreement part. Maybe I'm misunderstanding your argument. I thought you were now arguing that affirmative agreement or no, the extension didn't apply to your client because they weren't members of the association. Well, I'm arguing both, Your Honor. I know. But you began with the first one, and I want to know whether it was ever argued before and where, and whether it's in the district court, because I don't remember seeing it. I know the second one, the part about the affirmative agreement, but this one I don't remember seeing, and I want to know where it is. The only other reference to it that's in the underlying record, well, yes, it was raised to the district court. The district court did address it in its decision. All right. Well, I'm not going to look for why. Go ahead. And it was also raised before the panel. Both of them were. The other place it's referred to is in the panel's third hearing where it was presented to them again that that 2009 memorandum was not binding. And that excerpt from that is attached in the supplemental excerpts from the record at pages 233 through 234. Was the arbitration panel affirmatively obligated to address that discrete issue? Well, it was given what happened here, because remember what the panel found is that this 2009 memorandum agreement was the document that extended the underlying master labor contract. Without that extension, then the timeliness was entirely appropriate. The termination was effective. But the court did, I mean, the arbitration panel did address the MOU, didn't it? Yes. And it addressed all of the agreements in both of the interim awards, didn't it? Not really in detail. What it simply said... I understand that. But it addressed, it analyzed the MOU in both of the interim awards. In the second one and then confirmed it in the third. It never made a mention of it in the first. That's all it was required to do, isn't it? Actually, for it to do that exceeded the scope of the submission that was originally before the panel. The submission agreement is what controls, not the contract. And there's a case cited... Can we go back one minute to basic principles? What is your understanding of the standard that we're applying here in looking at the contract? There are two different standards, Your Honor, depending upon whether we're talking about affirming or vacating the award for public policy reasons. I'm not talking about public policy. Okay. Or whether we're talking about plausibility. All right. What is... In the 2001 on-bank opinion, the Hawaii case, the court went on at some length about essential, which I understood them to say is, well, we're using the term plausible, but what we really mean is that they even purport to be interpreting the contract. And that is what I understand the Steelworkers Trilogy standard to be. Do you disagree with that? I agree with your analysis, Your Honor. That is not the standard. The standard is, if you look at the agreement and you look at what the arbitration panel found or decided the agreement means, is that a plausible, rational, reasonable interpretation? Oh, so you disagree with me? I'm sorry? So you disagree with me, then? Perhaps I misunderstood what the court was saying. Well, my understanding of the Hawaii opinion and of the Steelworkers Trilogy on which it was interpreting is that it's really not a question of whether we agree or disagree with it on any basis, but whether the panel itself looked at the agreement and came to a conclusion about the agreement as opposed to about a blue sky or something else. No, it's not simply did the panel address the issue. It requires more than that. On the basis of some understanding of the agreement, good or bad? No, it requires more than that, Your Honor. Why? Why? What case? Am I misreading the Hawaii opinion from 2001? If that's the court's interpretation, yes, I suggest. No, she isn't, because the Hawaii Teamsters opinion, you know, says that the relevant inquiry is whether, quote, the arbitrator's decision concerns the construction of the contract. That's the standard. Now, is there some law, contrary to Hawaii Teamsters, that eviscerates that? Well, you have to read that in the context of the entire case and what we're talking about here. Okay. We can do that after you answer my question as to whether there's some law that undermines that ruling, that standard. I don't think that the court has accurately articulated the rule as it's applied to these circumstances. Tell me the rule, from the case, not from your gut. Very well. The rule is that the panel's determination must be overturned if the arbitrator has engaged in its own determination and has utilized its own whims or dispensed its own brand of justice. And in this case, that's precisely what happened. And you just went on a moment ago and told me, no, the standard is whether it's a rational interpretation of the contract. That's not the same thing. I guess we're getting into semantics here, Your Honor. In my mind, it is the same. It really makes a difference, actually. Well, my last articulation is what the standard is. The arbitrator is not free to dispense its own brand of justice. And that's precisely what happened here. You're telling us what the standard is not. I'm asking for an affirmative articulation of what the standard is. The reference that you made about dispensing one's own brand of justice, it can form the basis for overturning the panel. That's not the same as our question as to what is the standard. I didn't ask what the standard is for overturning the panel. I asked what the standard for the efficacy of the arbitrator's decision. I misunderstood the court's question. My apologies, Your Honor. That's all right. I thought you were asking the standard that I need to establish. No. No. Certainly, the arbitrator, if it looks at the questions and makes a determination, a standard at liberty to disrupt those unless one of the four exceptions applies. In this case, three of those four exceptions apply. And two of those four apply twice. The public policy exception applies twice, as does the plausible interpretation of the contract apply twice. So shifting briefly to the public policy, I want to point out a couple of things. What is the dominant public policy that you claim was violated? There are two independent ones, Your Honor. First of all, the principle that multi-employer bargaining rests and relies and is contingent entirely upon the consensual relationship of the parties. And no one can be forced into multi-employer bargaining. The second one is that employees are free under Section 7 of the National Labor Relations Act to choose whether they want to be represented by a union or alternatively. Do we have any evidence of any kind about the opinions of the employees as to union representation? Yes, Your Honor. The court, the underlying district court, did not consider the evidence that was submitted to the court because it... Well, how could it do that? It has to base its ruling on what was before the panel. Because, Your Honor, this court has held in Aramark Facility Services versus SEIU Local 1877, which is found at 530 Fed 3817. It's a 2008 Ninth Circuit opinion. That in a public policy setting, when you're dealing with a challenge to public policy, of course the court can address that for the first time. That's standard. Of course it can address it for the first time, but can it bind facts? That's a different question. Yes. That case, Aramark case, specifically said the court can consider new evidence so long as it does not revisit the panel's factual findings. So it cannot find evidence contrary to what the panel found, but it can consider new evidence, which intuitively makes sense because you don't know you've got a public policy issue until after the arbitration award is rendered, and it may take additional facts, as it did in the Aramark case. What were the facts that you submitted? It doesn't sound right to me, but go ahead. What are the facts you submitted? So the facts that were submitted there, Your Honor, were that there was no union representation at all at the time the 2005 membership memorandum agreement was entered into, that the union never sought or asked or requested to be the representative of Drywall Dynamics employees, that the union never proffered any representational status, and that throughout the entire relationship, the fact was before the panel was that Drywall Dynamics never consented to that representational status. But nothing about the actual views of the employees? Well, Your Honor, So how could there be a public policy not to overturn, not to over, I mean, the employees, as I understand it, could have, if this was an ADEF, your position ultimately, all of that goes to this is really an ADEF relationship, right? Yes. If it was an ADEF relationship, my understanding is that the employees at any time could have filed for an election. If it is an ADEF relationship, they can. Right, and they didn't. If it's a 9A, they can. And they didn't. Right? So there's no indication of any discontent by the employees, because they could have, on your view of what was going on here, filed for an election. The case is that At any time. The cases that are cited in our brief specifically hold that you cannot convert an 8, Section 8 contract into a 9 contract without certain criteria that are identified in the brief. Okay. So your position is this was never a Section 9 contract, so therefore the employees could have done it at any time. I mean, it said it was a Section 9A agreement, but that doesn't mean it was. And so your position is that it wasn't, and if it wasn't, then the employees could have just filed an election any time. If it was a Section 9 agreement, they could have filed it when the agreement came up. So they could have expressed their views, and they never did. Well, they did in the sense that they tried multiple times every year from 2008 forward. They tried to terminate this contract through their employer. Employees did? Through their employer. Through their employer? Yes. Employees never expressed a view as a group, or individually. That we know of anywhere in this record. Either way, Your Honor. Either way. I have one more question about the public policies. Are these competing policies, the two policies that you articulated? No, they're not. They're not competing policies? No, they're very different. The first policy applies to a situation that was here where you have an employer representative that represents an entire group of employers for purposes of bargaining with a union. A multi-employer collective bargaining agreement situation. And the public policy requires consensual relationships in that kind of a setting. The second public policy deals with the employees who are being forced here to be perpetually bound to disagreement by the panel's interpretation. So they could have filed for an election any time they wanted? Well, there are certainly hypotheticals that apply here, Your Honor. But the facts are that the union had no representational status. And as a consequence... But who's being forced to do anything? The employees are being forced to continue in the relationship. Which of the two policies was dominant? Or were they both dominant? Each one independently is dominant, yes, Your Honor. But you could have independent dominant policies. You could have any number. Correct. Okay. It's like having, you know, co-number ones or several winners. Yes, and the district court specifically found that this was a dominant policy. Which was a dominant policy? Well, both. Because it held the first one was one of the reasons for it to set aside the arbitration board. Is this... Where is... Aside from the fact that there are competing policies, where is this policy? Where would I find this policy? Are you referring to the one about the employees being free to choose? No. The court didn't rely on that, ultimately. I'm referring to the one about the voluntary... The right to be voluntarily associated with the multi-employer association. There are a number of cases cited, including the Supreme Court... Does the National Labor Relations Act have anything direct to do with this? Direct, I would say no, Your Honor. But indirectly, absolutely, yes. The policy rests on the concept that in order for an employer association to represent its members in binding them to an agreement with the union, both the members and the union have to acknowledge, accept, and agree to that relationship. And absent that kind of consensual agreement, there can be no voluntary multi-employer bargaining for contracts. Okay, you're way over your time. I know. Thank you, Your Honor. We kept you very busy. Thank you very much. Okay, so I wanted to start by addressing the membership issue that counsel raised. The arbitration panel was well aware, based on what you're saying, whether Dryall was a member. The director of the employers association was on the panel and sat in on the hearing dates. His name is Bob Campbell and he's listed as someone who was there. So perhaps there was like an implicit finding that the 2009 MOU could be applied to Dryall. And implicit findings, just like explicit findings of an arbitration panel, are also accorded substantial difference. I thought there was an explicit finding. It says, the contractor's contention that because it was not a direct part of those negotiations, it was not bound, is not a defense because the contractor under the Evergreen Doctrine continues to be bound until it provides timely notice. In this case, the notice would have been during the window of time in 2011. And it also says earlier, this contractor was bound by the negotiations and agreements of those parties. Correct. But I was just going specifically to the membership agreement aspect because it seemed like counsel was arguing that that was never dealt with and the panel was well aware of that fact. Additionally, about the AF versus 9A NLRA kind of relationship between the parties, the memorandum agreement and the master labor agreement both explicitly state that the relationship Well, does that actually matter though? It doesn't really matter. I don't think that it matters because the district court didn't seem to find those reasons. But if it were an AF agreement, the employees could have filed for an election at any time anyway. Correct. So in terms of the employees' interests, one way or another, their employees' interests could be expressed. Correct. I just wanted to touch on that in case there was any confusion on the union's position. But also with regard, I know you guys spoke about the standard in the Hawaiian Teamsters case and I think that the case does say that the arbitrator's award should only be overturned if there's a complete disregard for the contract. And based on the arbitrator's or the Utah panel's arbitration awards, they did look to the contracts. They looked to the 2009 MOU and they looked to the Master Labor Agreement. While it might not be something that the court agrees with, they were trying to interpret the contract. And Hawaiian Teamsters also says that the fact that an arbitrator arguably misinterpreted a contract does not mean that he did not engage in the act of interpreting it. Can there be more than one dominant policy? I'm shifting gears for a moment here. Sure. I guess that there could be more than one dominant policy because from my understanding of the public policy standard, it should be something that violates a particular statute or some kind of law. And given that there are a number of statutes and laws, there could be a number of public policies out there floating around. But are there multiple ones that apply here to this case? I don't think so. Why not? Because the standard is an explicit well-defined policy. And as far as the voluntary association between the multi-bargaining units, it doesn't seem to be that explicit or well-defined because you can't find a number of cases describing this as a public policy except for that 8th Circuit. And also, because there are competing policies, stability and voluntariness, the question of which one kicks in at any particular time can't be determined simply by the policy. It has to be determined by something else because there are two policies. Right. And I think that it would require fact-finding which the district court was not permitted to engage in while I believe it's opposing counsel's opinion that the court can engage with fact-finding with public policy arguments. That's not how I read the cases to be because the parties did delegate fact-finding to the arbitrator for all facts not just for the interpretation of the agreement. So if a party doesn't raise a public policy argument or if a party doesn't raise some kind of defense Well, it has to I mean, it seems right to say that the public policy determination is ultimately de novo for the court. No? I mean, at least as to I don't know where the fact-finding fits in Right. But it is a little odd to ask people to exhaust that question because whatever the panel would decide wouldn't make a difference would it? Well, I think here it could have been raised to the arbitration panel not specifically in saying that this violates this public policy but they could have raised the affirmative agreement argument more strongly. They could have I understand that I'm talking about the public policy question No, I guess they probably would not and it would be an unusual circumstance but they still should be stuck with the facts that the arbitration panel found So, I guess it's not an ideal situation because the parties delegated this fact-finding authority but the courts maintained the discretion to make the determination about the public policy but what the court can rely on is only what has already been developed Okay, thank you very much Thank both of you for a useful argument and an interesting argument The Southwest        Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you                Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank you Thank nothing Thank you Thank you Thank you Thank you Thank you
judges: Berzon, Owens, Marbley